Congratulations on your appointment. I know you've only been here since May. I want to start out by saying Mr. Martinez is not the most likable character in this story. He worked for Waste Management. Are you making that giant concession? Are you out of the bank? Right. I want to make that perfectly clear. He's not a nice guy, but he didn't do what they're claiming he did. He worked for Waste Management. It's a trash collection company that works out of Northwest Houston. He was in the wrong place at the wrong time with the wrong people. Yes, sir. That's usually how it works with these folks. So make sure that we understand where you're going. Right. He was a lead driver. He worked there for a long time, but he worked for Waste Management. So he was a driver, and there was helpers on the truck that would follow along behind the truck and pick up the trash and put it in the truck. He took advantage of the helpers. I mean, they would bring him coffee and donuts and little treats and things of that sort, and he would give them special routes or special privileges. But what he didn't have the authority to do was to hire and fire any of these people. The authority came through AMI, which was a staffing agency. I think there were maybe one or two other staffing agencies before AMI, because this had been going on since maybe 2006 up to 2012 or 2013. So there were a couple other staffing agencies. And then AMI came along, and they were run by Mary Flores, who was the on-site supervisor, and a fellow named Cesar Santiago, who in my brief, and it's pretty well acknowledged in the record, that he was the boss of bosses. He was the manager. He was the one that could hire and fire people. Counsel, all three of your arguments are sufficiency of evidence arguments. Is that correct? Yes, sir. Okay, and the first two pertain to the conspiracy counts. Is that right? That's correct. Okay. Yes, there's two conspiracy counts, and then there's two aiding and abetting counts, and then the last four. Or substantive. Aggravated identity thefts. Right, okay. So when AMI supplies them, they supply the workers there. He doesn't, I'm sorry, AMI supplies the helpers to waste management. Now, Mr. Martinez is a lead driver. Israel Martinez is a lead driver. So he doesn't have any control over who works at waste management. It all comes through AMI. So AMI hires the people, sends them over as helpers. They got audited at some point and found out a lot of the workers were illegal, which is quite common in Houston. I mean, half the restaurants in Houston would close down tomorrow. They actually enforced the law. Yes, ma'am. Now, what happened to Mr. Santiago in this conspiracy? He cooperated. Senator Santiago cooperated. What sentence did he get? I do not remember. It was a reduced sentence for his cooperation, but he did cooperate. Is Mr. Martinez an American or a legal immigrant? He was legal. He was working legal, as far as I can remember, yes. And he was sentenced to 87 months. Right. Mr. Arroyo, he had a higher level of involvement, but I don't believe he had as much criminal history as Mr. Martinez did. He had some extra criminal history. Well, cutting to the chase here, I mean, you know, the evidence is that Mr. Martinez suggested using the identities, stealing the identities of former applicants. Now, how would Mr. Martinez have been in a position to know about that? Well, Mr. Martinez, because he worked there for so long, he knew the people. And when they got audited and a good bunch of their workers were discharged, his idea was, well, why don't you just use names of people that worked here before? Well, if they were illegal and they got discharged, then they'd have illegal identities, right? Or was it just the numbers they were going to use? No, I think they just audited them. I think they were working there illegally, too, during that entire time. But when they audited them, they said, hey, look, these folks are all illegal. You need to get rid of them. Those were the long-term illegal employees, I guess. They were. Some of them worked there for years, years of kids because that's obviously the only job they could get. But they were – this is intense, difficult labor, and people just can't do this. They were mostly young Mexican immigrants or Guatemala or Honduras or El Salvador, and they could handle the tough, hard work, where most people couldn't. I couldn't last ten minutes out there, but they could work all day. And some of them worked for several years there. But anyway, he didn't have the power, and that was the main part of my argument, is he didn't have the hiring authority to do that. So all he did was, hey, if you want to get some workers in here, just use the names of previous workers. And it was left up to Mary Flores and Cesar Santiago because they had access to the information, the Cronos system, and they could put in the PIN numbers, the identification numbers, so they could prepare all the paperwork and all the documentation they needed to have these people come back to work. How does the lack of authority help you with regard to being a conspirator or an aider and a better? I mean somebody had to have the authority. If it's not him, he could still, assuming the other evidence is sufficient, he could still be convicted as a conspirator, couldn't he? Well, in my mind, I would say no because he just presented them with the idea to do it, and he just left them up to do it. It's as if we all got together and you folks couldn't pay your bills. I said, well, why don't you guys just go rob a bank and pay your bills like that, and you go rob the bank. That doesn't make me the conspirator. I gave them the idea, but they went out and they did all the necessary things that they needed to do. But is that all he did? Are you contending that that's all he did was drop the suggestion and then walk out, and the next thing we know, these people were back working? He dropped the suggestion, and he gave them names of people that worked there before. But other than that, it's pretty tenuous because they could just go back in time and look at all the people because Mary Flores and Cesar Santiago and I think another person whose name I can't remember right off the top of my head all had access to this information from AMI, and that's the key part where Mr. Martinez comes in is he doesn't have access to this information at AMI in order for those people to come back to work and for them to change the documents and everything. Do you argue that your client's evidence doesn't sustain him as a part of the conspiracy? I don't mean do you concede it, but I mean do you acknowledge that there's strong evidence of his being involved in the conspiracy and you know what the conspiracy law is? So how do you—well, not how, but what's the most probative evidence on the one hand if he's an active participant in the conspiracy given the law, and on the other hand, your argument that he's marginal out on the extreme margins of this operation in terms of not hiring? I mean, I hear you, but— Well, I guess my position is he—I'm thinking he just knew too much, and he knew that there was a conspiracy going on, and he gave them the idea, but it was Mary Flores and Cesar Santiago that did everything. Now, he knew that these people were coming in. He knew that they were illegal because they'd been illegal for years and years and years. So he knew what was going on the whole time, and what makes him look bad, I think, is because during the trial, he was just so abusive to his workers. I mean, they would get hurt on the job. He wouldn't report it because he wouldn't make any money off them, and he would have to file the safety report. And that's another part of the hiring the employees is you have to—one of the elements is you have to do it for profit, and he wasn't profiting off of the hiring and firing of the employees. His bonuses came from the safety regulations that he was comporting with and the productivity. So as long as the workers were there, he wasn't getting paid for bringing in new workers or hiring new workers. He couldn't hire them anyway, but that's not where his money came from. His money came from safety bonuses and productivity bonuses. So he wasn't making any—that's an element that they missed is he wasn't making any money from them being hired. On the next—the next conspiracy, this is the one that bothers me the most, is the inducement for these folks to stay in the United States and work. These people came from horrendous conditions, and they—most of them came from—went through a really difficult, harsh time to get to the United States. In my opinion, they don't need any inducement to stay here in the United States. They're here to stay. You would have to induce them to leave. Well, if they couldn't get a job, it would be a disincentive. They would just go work somewhere else. I think that's— Well, now that's—I mean, the law doesn't—says they're not supposed to be working in the U.S. if they're illegally entering, right? Right. I agree with that. But what they're claiming is—what the government is claiming is he induced them to stay here. And my position is they don't need inducement to stay here. It's the company that induces them. What happened to the company? Well, that would—then that would be back to AMI. I understand that. Did any—well, no, I'm thinking of waste management. Well, AMI is the one that hires them. AMI hires them, and AMI fires them. So going back to the first argument, if AMI hires them, AMI can fire them. That's the inducement that's coming from AMI. It's not coming from Mr. Martinez because he doesn't even have that power to do that anyway. Are there any cases that are similar to this with what amounts to at best middle management employee being held liable criminally here? Not that I could find. I mean, as much as I did looking through it, I couldn't find anything that was relatively similar to this. Most of the cases were drug conspiracy cases, alien smuggling cases. No, the inducement about inducement to reside in the U.S., those prosecutions. I'm sorry? You were just talking about inducements to aliens to reside in the U.S., that 1324A whatever it is, A4. Right. Right. But I didn't find any cases where there were a similar situation where you had an individual like Mr. Martinez where they, I don't want to say they worked for him. They didn't work for him, but they worked with him. But I didn't see any cases where they were similar to what you're speaking of because he was just a lead driver. AMI supplied the lead drivers with the helpers. Excuse me. So I didn't really find any cases that were on point or similar to that for the position that he had. With my last two minutes, the final argument is regarding the identity theft, and that goes back to kind of the same thing that the other ones were related to is he doesn't have any of the information needed for the identity theft other than he knew the names of some of the people that worked there from before that. They had to go through AMI again, through Mary Flores and through Cesar Santiago, through the Cronos system, and they had to backtrack years ago to find out the people that had worked there before. Some of them would work there for a couple of weeks and leave, and most of them were United States citizens, so Mary Flores, Cesar Santiago would use their names and fix up the paperwork so somebody like Juan Garcia would have to change his name to Juan Jimenez and then continue to work there under that name. But it was Mary Flores, Cesar Santiago that had access to all that personal information, the PIN numbers, the Cronos numbers, Social Security numbers, all those things. So you're arguing in essence on each of these, for all of these counts, that at best he could be charged with and found guilty of a misprision. Is that a fair statement? Yes, that would be a fair statement. Okay, so it will depend on the government to tell us then what overt acts they think would raise this above a misprision count. But, I mean, you can see that he knew what was going on. In fact, he was one of the suggesters of the whole plan. Yes, he was. Well, with respect to getting the new employees in, he said, yeah, well, just use the names of people that worked here before. Then he knew after, after they did it, oh, look, they followed my suggestion, here come all these people that I've seen before. So he obviously knew that he not only suggested it but that they executed his suggestion. A misprision or felony would be perfect. That would be sensible. Okay, well, we'll see if the government can point out some overt acts. Fingers crossed. All right. Thank you, Mr. Williams. You have reserved your rebuttal time. Are you going to ask Barry? Barry. Barry. That's okay. All right. May it please the Court, Loretta Barry for the United States. Overwhelming evidence exists in this case to support that Martinez knew and played an active role in this hiring conspiracy. The co-defendants, Santiago and Flores, Santiago was the operations director at waste management, and Flores was the AMI on-site staffing coordinator. They both testified at trial, and they both pleaded guilty to the conspiracy. At the time of trial, they had not yet been sentenced. What are their sentences subsequently? I do not know that, Your Honor. I apologize. They testified that it was common knowledge that even before 2008, the bulk of the helper workforce at waste management were illegal aliens smuggled from Mexico, El Salvador, and Honduras. The problem was so bad that AMI sent Flores to clean house at waste management because there were at least 100 illegal helpers. In January of 2012, approximately 60 to 70 illegal helpers were fired, and they were told the people that were present were Martinez, Flores, and Santiago. They were told to go out and get legal status if they wanted to remain employees. Shortly after the firing, Martinez was the mastermind of this scheme. He proposed a scheme to Flores wherein they would rehire these helpers that they had just fired, and they would reassign identities from former legal applicants and former legal helpers. Let me ask you a question. What, if anything, has happened to waste management? They're still in legal proceedings, Your Honor. I spoke to the trial attorney a few days ago, and they're still in talks, possible settlement. Is that a civil charge? It's criminal. Under what provision? Or maybe they haven't been indicted. I think they're still—I don't know the status of—I think they were still in talks. Okay, I just—because they seemed like the elephant in the room to me. Yes, and there were still other people that were higher up in the management that are being investigated. Was waste management sent a target letter? I mean, they're a target, and so these conversations are going on because they know the bullseyes on them. I'm sure they do, Your Honor. I mean, they've been confronted by the government in a criminal context, because I thought you were leading to say this was civil, but no indictment has occurred. I don't believe it has yet against waste management, no. Okay. All right, tell me—you said Martinez was the mastermind, quote, unquote. So given what we sort of understood of where he fit into kind of a hierarchy here, maybe he wouldn't tend to—one would think, you know, this person, kind of where he is, would just have the genius to say let's do X. So given that position, what's his incentive here? I mean, what's the payoff? Well, he wasn't— On the one hand, if he's positioned to where he was, but on the other hand, counsel acknowledges he preceded the idea. You said he was the mastermind, which if you watch enough TV tends to mean, you know, you not only plant the idea, but you're sort of pulling the strings, etc. You get my point? Yes. The evidence to firm up him being, quote, the master—beyond suggesting that, what more is there? Yes. Let me lay that out, Your Honor. So what he did is he proposed this scheme, and Flores and Santiago agreed to it. And so what happened is that multiple times a week he would go through with Flores the old routing sheets, the old worker sheets from past workers, and tell her which workers no longer worked there and which workers were legal and their identities could be assigned to these newly hired people. And the reason he knew that is because he had worked there for almost 11 years, and he knew all of the people that had worked there in the past and that had been legal. And Flores had only worked there for 11 months. She didn't know these helpers. She didn't know any of the former employees that had been legal. So multiple times a week he helped her do that. She also testified that he helped her create her cheat sheet, which was assigning PIN numbers to these new rehires, as I say, the illegal aliens. But the evidence is that he actually participated in assigning to a man— The number, yes, Your Honor. And then he— He didn't just turn over a bulk of information. Here are a bunch of identities, which may or may not be bad enough, but you're saying that there's evidence that he actually participated in corresponding an identity with an individual. Yes, he did, and he actually passed that out to the helpers. And there's testimony from eight helpers themselves that testified to Martinez's role. They stated that after the 2012 hiring, he personally called them back on the phone and, in some cases, gave them the new identity over the phone. Let me give you an example of that. Garcia Lopez, one of the fired helpers, testified that Martinez called him and said, Don't worry about your job. You'll work under the name of a different person, that name being Thomas Gomez. Guzman Ventura testified that Martinez actually called him on the phone and gave him the name Juan Zelaya to come back to work with. All the helpers testified to the same story, that they had worked there for years, even before AMI assumed the contract. So the agreement for the plea with Santiago and Flores was they—this was a nine-day jury trial, so they unfurled the relative roles that everybody plays. So I haven't read the record, certainly not all of it, but will I understand if I read Flores' testimony and or Santiago, she is going to testify not only about Martinez planning the idea, but this weekly participation, et cetera, et cetera. Is that correct? That's correct, Your Honor. All right, so then my question, she testified on the rec. So on the cross-examination of her by the defense, what, if anything, either rebutted that or did the defense put on that trial something different? In other words, if the jury accepted her version, was there anything brought on cross-examination that would thwart that whole notion? I don't—I believe that their theory at trial was that Flores had the authority to hire. That would be, I believe, where they went on rebuttal. So if Flores is testifying about all this and, you know, it's up to cross-examiner, I mean, what they ask her. If they say it ain't so, I wasn't there, or basically her testimony was left unchallenged. Is that fair? If I read the record of her testimony and read the cross, will I come away with the view essentially what she said was unchallenged? I believe that's correct, Your Honor. I can't— Now, why don't you know that? Because it was—I can't exactly recall the entire cross-examination. That's the whole point of having oral arguments. So when I ask and we ask these questions, we get the answer of what you know is there. If I'm going to have to read the record, then I expect the person from the government to know what's in there, whether you tried it or not. But, you know, to kind of know. It's a sufficiency challenge across the board. So, you know, if it's not a case there, it's the acknowledges then to know at least not every tittle and word, but the core of what's supporting the government's case, as opposed to us having to pour through thousands of pages to support it. That's not meant to chastise. It's just to say that's the expectation of why we grant oral argument. We're going to read it, but to kind of know. I just—I believe that her testimony would be unchallenged when you consider the fact that eight helpers testified consistently to her story, when you consider the documents that were introduced at evidence, and what those documents were were the route sheets that Martinez signed and that the helpers identified that he signed under their new names, even though he had known them for so many years under a different name, the testimony that he had distributed paychecks to these helpers that he had known for years under different names. I'm going to ask you how they got paid if they had identities that were not in Social Security numbers, I assume, or government ID numbers that were not theirs. They were paid by check. Is that correct you just mentioned? Yes, Your Honor, and what they did every Saturday is they had a mobile truck that came and cashed these checks. They cashed the checks right there? On the spot every Saturday, yes, Your Honor. In addition, waste management employees also testified, and this corroborated Flores' testimony, because Rose Shuler was a legal helper, and she testified that Juan Mejia, the helper that she had, excuse me, Rose Shuler was a driver, and she had a helper who was illegal, and he had worked for her for years. His name was Juan Mejia. He was fired in 2012 and then came back, and she was thrilled to see him and said, Juan, I'm so happy to see you. Martinez pulled her over to the side and said in a low voice, his name is David now. Call him David. In addition, Victor Silva was another legal employee, a driver, and he complained to management about the fact that all these people were coming back with new names. He was told to mind his own business. He also saw Martinez and Rudy Martinez writing down the names of new people each week on a blackboard. And finally, Your Honor, the additional piece of evidence that corroborates Flores' testimony and that is sufficient under the Jackson v. Virginia standard is Agent Paredes' testimony. He testified that he interviewed individually six of the helpers, and they all told the same story about how they were fired in January 2012. Then they were rehired shortly thereafter, given new names, and in many cases Martinez called them on the phone and gave them the new names over the phone. Did you say that Martinez was charged with the responsibility of passing out the paychecks on a Saturday? They all shared that responsibility, Your Honor. They individually shared that role. Flores and Santiago and some of the helpers testified that sometimes Martinez would pass them out, sometimes Flores would pass them out. And, in fact, Terry Minarsik testified that that really bothered her, that Martinez was passing out the paychecks when he wasn't an AMI employee. He was a waste management employee. Is it my understanding that some of the illegally hired workers testified during the trial? Yes, Your Honor, eight of those testified. Right. So is it further that, in addition to the testimony of Flores and Santiago, that some of these workers also testified to Martinez, either pointing them to the sheets or the documents or telling them where to go or whatever, whatever? Yes, that is absolutely correct, Your Honor. Campos Lopez and Garcia Lopez, two of the helpers that testified, stated that Martinez actually called them, told them where to go to process their new identities. He gave them the identities of G.A. and Thomas Gomez. So he actually called them, instructed them on where to go and process the new identities. Because the evidence is sufficient on the conspiracy count, it is also sufficient to support the substantive counts as well, under Pinkerton and under aiding and abetting. With respect to conspiracy to reside in the United States, the evidence is sufficient to support that count because the statute doesn't just prohibit bringing aliens in, harboring aliens. It also prohibits encouraging them to remain in this country. And the Eleventh Circuit has two cases on point and a couple thereafter that state that providing identities to facilitating employment is actually encouraging residency in the country. And that's exactly what happened here. Martinez helped these people remain in the U.S. by giving them legal work documents. May I? This is the second case of this 13A4 prosecution that I've seen in our circuit. Maybe there are more. Maybe it's one of the crimes du jour. But I know you have the prime case in the Eleventh Circuit, and the other one is the Kanani case, right? It's the Nadia case. Well, there are several, a couple others. But most of those were more like managerial employees, weren't they? They were managerial employees. But, Your Honor, I would argue that he did exercise a managerial role. By the time that this scheme had taken place, he was no longer just a driver. He was actually a—he was no longer just a low-level driver. He was actually in charge, like a supervisor in charge of the route, the residential route. And that was a pretty big role. The helpers testified that he had a lot of influence because he could put certain ones on the schedule and take certain people off, get a better schedule. He had a lot of influence. There was evidence that a lot of the helpers tried to bribe him with food and Starbucks and things of that nature. So he wasn't—he was not a low-level employee by the time that this conspiracy happened. With respect to the aggravated identity theft, Martinez's argument that he didn't have access to the AMI database really is not significant because he had worked there so long he didn't need to have access to the database to know which former employees on the route sheets had legal status. He was able to tell Flores, oh, this helper doesn't work here anymore. You can use his identity. And Flores testified to that. Real people—the whole purpose of the scheme was to use real people's identities, people that had passed the E-Verify system. If there's no further questions— Just one last one. Yes, Your Honor. What was his—I mean, I know what you're arguing in terms of how his role morphed, but did he receive some kind of financial benefit from all of this? Yes, Your Honor, he did. His financial benefit was tied to the productivity of these helpers in terms of safety bonuses, and both Flores and Santiago testified that these illegal helpers were amazing workers because they never complained. They never basically called authorities about the situations that they were working under, and they never took days off. Sometimes they worked double shifts. So the safety record and the productivity record was tied to his bonuses, and so that is where he received his financial benefit from. One thing I forgot to mention that Judge Jones had actually asked, Martinez is actually a legal permanent resident of El Salvador. He's not a full citizen of this country. If there's no further questions, I respectfully request the judgment be affirmed. All right, thank you. All right, we're back to you, Mr. Williams. I just wanted to address the Court briefly about—excuse me, on cross-examination about what Ms. Flores had said. On the record at 1025, Flores made it clear that Mr. Martinez did not have the authority to hire people to work at either Waste Management or AMI, and that's the record at 1025. Ms. Flores also testified that she alone hired five aliens, but the others were hired by the AMI office. Once again, it's the AMI and it's Mary Flores and it's Cesar Santiago handling everything. Rose Shuler testified that Mr. Martinez didn't hand out any checks to anyone, but whether he handed out checks or whether he didn't is rather incidental. But she testified that Cesar Santiago Arroyo was the boss of it all. He was the boss of bosses, and things were his way or no way, and that's the record at 1160 and 1161. What do you do with the testimony of the workers? Their complaint was they were mistreated, and that's why they were cooperating with the government. I think there were several— Well, let me ask the question more precisely. I'm saying beyond Flores and Santiago, if there were eight of the workers, the illegal workers, who testified and who testified, as I understand, to Martinez's active participation in terms of directing them to go here or whatever about the documents, et cetera. So we hear your argument that he was not titularly the manager or whatever, whatever, but the testimony seems to be in here that notwithstanding whatever his job title, that he was indeed active with the workers themselves, with the payroll, da-da-da-da-da-da, to moving beyond just sort of being out on the margins, and I'm just asking, what do you do with that? The only thing that he did was he told them, you guys can't work here unless you have proper documentation. Go get proper documentation, and when you get it, take it to Mary Flores, and she'll handle everything. And pretty much everyone testified to something similar. A lot of these fellows got their own documentation. I don't look through the record there. I couldn't find it real quick, but several of them got it from their relatives, got it from their parents or their brothers or whoever. But most of them, a couple of them, when they came to Israel, Martinez said, hey, I've got a name or a paper or whatever. He said, well, take it to Mary Flores. I don't have anything to do with it. So he kind of directed them, incidentally, as a misprision of felony, so he didn't. Didn't the government also allege, we just heard, that Mr. Martinez called the employee and advised of what the new identity would be for that person to return to work? Are you just dismissing that as not credible, motivated by a disgruntled employee? No, I think he did provide the names for some of them. He said, go back and use these names, but you have to go through Mary Flores and Cesar Santiago and AMI in order to get hired. So you can use these names because he knows people. He didn't have to go through the record books or anything. He knows people that have worked there for years before and says, go use these names. But, you know, it's like if you need money, go rob a bank kind of. That's my analogy is, if you need money, go rob a bank. But, you know, I'm not going to help him rob the bank. If you need documentation, go get documentation. When you get the documentation, take it to Mary Flores, and they'll do whatever they do because I can't hire you. So that's mainly my position. I don't have anything further. All right. Thank you. You are court appointed, and the court thanks you for your work in this case. I'm sure you've had other cases court appointed, but we heavily depend on our court appointed attorneys, and we appreciate your work in this case and all other cases that you're asked. No, I enjoy it. It's actually kind of fun. All right. Thank you, sir. Glad to be here. All right. Case will be submitted. We'll read it, and we'll figure it out.